AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

| LODGED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 03/12/2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ DM _____ DEPUTY |

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 03/12/2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ GR _____ DEPUTY |

United States of America

v.

AMIR ZIAFATHY,
SAIED ZIAFATHY NOBAR,

Defendants.

Case No. 2:21-mj-01242

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 29, 2019, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. § 841(a)(1), (b)(1)(C) | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Logan Bonifas, DEA SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    March 12, 2021
_____
*Judge's signature*

City and state:   Los Angeles, California

HON. KAREN STEVENSON,
U.S. Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT</u>

I, Logan D. Bonifas, being duly sworn, declare and state as
follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal
complaint and arrest warrant against AMIR ZIAFATHY ("ZIAFATHY")
and SAIED ZIAFATHY NOBAR ("NOBAR") for violation of Title 21,
United States Code, Section 841(a)(1) – Distribution of a
Controlled Substance.

2.   This affidavit is also made in support of an
application for warrants to search:

a.   the person of ZIAFATHY, as described more fully
in Attachment A-1;

b.   the person of NOBAR, as described more fully in
Attachment A-2;

c.   11915 Louise Avenue, Granada Hills, California
91344 ("SUBJECT RESIDENCE 1"), as described more fully in
Attachment A-3;

d.   2361 Overland Avenue, Los Angeles, California
90064 ("SUBJECT RESIDENCE 2"), as described more fully in
Attachment A-4;

e.   a white 2021 Jeep Compass bearing California
license plate 8RZE571 and vehicle identification number ("VIN")
3C4NJDCB8MT512332, believed to be rented and used by ZIAFATHY
("SUBJECT VEHICLE 1"), as described more fully in Attachment A-
5; and

f.   a white 2020 Tesla Model 3 bearing California license plate 8NVF463 and VIN 5YJ3E1EAXLF615652 ("SUBJECT VEHICLE 2"), registered to NOBAR, as described more fully in Attachment A-6.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), and 18 U.S.C. § 1519 (destruction of records) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1 through A-6 and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.   I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since April 2019.  I am currently assigned to the DEA's High Intensity Drug Trafficking Area ("HIDTA") division in Los Angeles, California.

Additionally, I am a member of the HIDTA Fusion Task Force, which investigates opioid-related cases and suspected opioid-related overdose deaths in Los Angeles County.  The HIDTA Fusion Task Force is comprised of DEA and FBI agents and local law enforcement officers designated as Task Force Officers.

6.   Prior to my employment with the DEA, I was employed for five years by the Ohio State Highway Patrol as an Intern and State Trooper.  My work in drug investigations has included conducting and participating in physical surveillance, drafting and executing search warrants, and conducting arrests. Additionally, I have interviewed narcotics users, buyers, sellers, manufacturers, transporters, and informants regarding various methods they use to safeguard their drugs and illicit proceeds and to avoid law enforcement detection.  Based on my knowledge, training, experience, and conversations with other experienced law enforcement officers, I am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of monetary proceeds of drug trafficking.  I am also familiar with how digital devices and electronic messaging are used to facilitate and conceal these crimes.  My experience as a DEA Special Agent and State Trooper have allowed me to develop a broad understanding of drug crimes, drug offenders, and the daily operations and common practices of drug trafficking organizations.

### III.  SUMMARY OF PROBABLE CAUSE

7.   On or about December 30, 2019, M.Z. died of a drug overdose.  M.Z.'s boyfriend, E.C., told law enforcement that ZIAFATHY gave M.Z. two blue pills the night before she died. Law enforcement found one of those blue pills in M.Z.'s bedroom and it tested positive for fentanyl.

8.   Text message communications and GPS location data show that in the evening hours of December 29, 2019, ZIAFATHY picked up the two pills from his uncle, NOBAR, shortly before ZIAFATHY delivered them to M.Z.  Moreover, communications reviewed from ZIAFATHY and NOBAR's Apple iCloud accounts suggest that ZIAFATHY and NOBAR continued to be involved in drug trafficking following M.Z.'s overdose death.  ZIAFATHY resides at SUBJECT RESIDENCE 1 and drives SUBJECT VEHICLE 1.  NOBAR resides at SUBJECT RESIDENCE 2 and drives SUBJECT VEHICLE 2.

### IV. STATEMENT OF PROBABLE CAUSE

9.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   M.Z. Found Dead from Fentanyl Overdose**

10.  On December 30, 2019, officers responded to M.Z.'s residence for a death investigation.  Paramedics were also on scene and pronounced the victim, M.Z., dead upon arrival.  The officers did not observe any evidence of trauma to M.Z.'s body, or any evidence of foul play.

11.  The officers also observed a blue pill and foil paper with burnt residue resembling heroin near M.Z.'s bed.  The blue

pill contained the following inscription: "M | 30".  I am aware, based on my training and experience, that this inscription is consistent with that found on legitimate brand name and/or generic versions of Oxycodone Hydrochloride 30 mg.  However, based on my observations of the pill, which appeared brittle and crumbling, I believe this pill was not manufactured through legitimate methods but was instead made illicitly.  Under such circumstances, where illicit drug manufacturers make their own pills, it is common for these individuals to lace the pills with cheaper, derivative ingredients such as fentanyl, which is very potent and dangerous.  DEA Southwest lab confirmed the blue pill contained fentanyl, as well as tramadol and acetaminophen.

12.  Officers spoke to M.Z.'s boyfriend, E.C., who stated that on the night before M.Z.'s death, ZIAFATHY, M.Z.'s estranged husband, came to M.Z.'s house and gave her a baggie containing two blue pills.  E.C. stated that M.Z. took one of the pills and then went to sleep.[1]  At approximately 6:00 a.m. the following morning, E.C. woke up and found M.Z. unresponsive. E.C. and M.Z.'s mother, C.P., attempted to resuscitate M.Z. but were unsuccessful.

13.  Officers also spoke to C.P., who stated that M.Z. was recently separated from ZIAFATHY, and that M.Z. and ZIAFATHY had been using drugs for years.  C.P. further stated that ZIAFATHY supplies M.Z. with drugs.

---

[1] During a subsequent interview with E.C. in December 2020, E.C. clarified that he did not actually witness M.Z. take the pill; however, E.C. believed M.Z. took one of the pills since one was missing the next morning.

14.   From the Los Angeles County Coroner's Office case report 2019-09884, and speaking with the Coroner's investigator, I learned that M.Z. had approximately 20 ng/mL of fentanyl in her system near the time of her death.  The autopsy report states that M.Z. died from the combined effects of fentanyl, morphine, and hydrocodone intake.

15.   The Coroner's investigator also spoke to ZIAFATHY, who stated that M.Z. is known to smoke marijuana, but ZIAFATHY denied that M.Z. used alcohol or narcotics.  Additionally, ZIAFATHY told the investigator that he went to M.Z.'s residence earlier on December 29, 2019 to change a tire on her car and that M.Z. appeared fine.

**B.   Text Messages on M.Z.'s Cellular Telephone Reveal ZIAFATHY Delivered Two Pills on December 29, 2019**

16.   On June 18, 2020, the Honorable Alka Sagar, United States Magistrate Judge for the Central District of California, issued a warrant to search M.Z.'s cellular phone.  (Case no. 20-MJ-2868.)  The following communications are excerpts of what I saw on M.Z.'s cellular telephone pursuant to the warrant:

1.   Communications between M.Z. and ZIAFATHY

17.   On December 29, 2019, between approximately 8:34 p.m. and 11:05 p.m., M.Z. and ZIAFATHY exchanged the following text message communications:

M.Z.: "Can you pick up from him"

M.Z.: "Since you're near there"

ZIAFATHY: "Adel?"

. . .

M.Z.: "No from Saed"

M.Z.: "Aren't you near there"

M.Z.: "?"

M.Z.: "?"

M.Z.: "Yes or no"

M.Z.: "Hello"

M.Z.: "Hello"

ZIAFATHY: "In Burbank"

ZIAFATHY: "Yea"

ZIAFATHY: "I can take the 134"

M.Z.: "Can you get drop Him"

M.Z.: "Don't smoke without me"

M.Z.: "I wanna snort one"

18.   Based on my training and experience, I believe M.Z. asked ZIAFATHY to pick up controlled substances from NOBAR for her.  Specifically, M.Z. asked ZIAFATHY to pick up from "him," which she later clarified as NOBAR ("No from Saed").  NOBAR's contact information in M.Z.'s cellular telephone is saved under the name "Uncle Saed."  NOBAR is ZIAFATHY's uncle.

19.   The text message communications between M.Z. and ZIAFATHY continued:

M.Z.: "Just take one and a half for u"

M.Z.: "Yes?"

M.Z.: "Hello"

ZIAFATHY: "I think I only have enough for 2 just paid for the meal"

M.Z.: "Please"

ZIAFATHY: "1 and 1?"

M.Z.: "Ok"

M.Z.: "But please just have me owe him"

M.Z.: "I need the 2nd"

M.Z.: "Say Xmas gift"

ZIAFATHY: "I'll head that way you work thst out"

M.Z.: "Call me"

M.Z.: "Eta"

ZIAFATHY: "10-15"

20.  At approximately 11:05 p.m. on December 29, 2019, ZIAFATHY sent the following text message communications to M.Z.:

ZIAFATHY: "Come out"

ZIAFATHY: "Hurry"

ZIAFATHY: "Hurry"

ZIAFATHY: "Hurry"

21.  Based on my training and experience and knowledge of the investigation, I believe ZIAFATHY told M.Z. to come outside and get the controlled substances that ZIAFATHY picked up from NOBAR earlier that night.

> 2.  Communications between M.Z. and NOBAR, aka "Uncle Saed"

22.  On December 29, 2019, at approximately 1:50 p.m., M.Z. and NOBAR exchanged the following text message communications:

NOBAR: "2361 Overland Ave Los Angeles, CA 90064"

M.Z.: "Sent him a text. Do you she an oxy for me I can buy"

M.Z.: "Oxygen tank"

NOBAR: "Call me"

8

23.  Based on my training and experience, I believe M.Z. wanted to purchase oxycodone from NOBAR, as I know "oxy" is slang for oxycodone.  M.Z. later attempted to walk back the reference in her text message by using coded language ("oxygen tank").

24.  On December 30, 2019, at approximately 12:05 a.m., NOBAR sent the following text message to M.Z.: "Hey hun, I hope you got the package, Please don't forget about my heater tomorrow."  Based on my training and experience, I believe NOBAR is referring to the purported oxycodone pills as "the package" that ZIAFATHY picked up earlier from NOBAR, and what I believe ZIAFATHY delivered to M.Z. at approximately 11:05 p.m. on December 29, 2019.

**C.   GPS Location Data Corroborates Text Message Communication between M.Z., ZIAFATHY, and NOBAR**

25.  On November 6, 2020, the Honorable Patricia Donahue, United States Magistrate Judge for the Central District of California, authorized a warrant for historical cell-site information which included M.Z., ZIAFATHY, and NOBAR's cellular telephones, including from the night before M.Z.'s death, December 29, 2019.  (Case no. 20-MJ-5406.)

26.  Information produced by the cellular telephone carriers show ZIAFATHY's cellular telephone movement that night was consistent with the text message communications with M.Z. Specifically, after engaging in text message communications with M.Z. regarding "picking up" from NOBAR, cell-site data shows ZIAFAHTY moving toward NOBAR's residence, SUBJECT RESIDENCE 2,

where ZIAFATHY ultimately arrived at approximately 10:15 p.m.
Meanwhile, cell-site data shows M.Z. was stationary at her
residence.

27.  At approximately 10:43 p.m., cell-site data shows
ZIAFATHY moving away from SUBJECT RESIDENCE 2 and toward M.Z.'s
residence.  At approximately 11:05 p.m. – at the exact time
ZIAFATHY texted M.Z. to "come out," cell-site data shows
ZIAFATHY's location is at or near M.Z.'s location.

**D.  Follow-Up Interview of E.C.**

28.  On December 16, 2020, investigators interviewed E.C.
again and learned the following additional information:

a.  After E.C. arrived to M.Z.'s residence on
December 29, 2019, M.Z. told E.C. that ZIAFATHY was coming over
and that ZIAFATHY had "something special for her."

b.  When E.C. asked M.Z. what that meant, M.Z. stated
that she was getting the "unicorn of pills" from ZIAFATHY and
that she had "two on the way" – one for M.Z. and one for E.C.

c.  Later that night, M.Z. received a telephone call
from ZIAFATHY and went outside for approximately five minutes to
meet with him.

d.  Upon M.Z.'s return, M.Z. waved a small clear
baggie containing two blue pills at E.C. and stated, "there's
enough for two."

e.  E.C. did not take the other pill because he did
not like taking pills and E.C. had to wake up early the next
morning.

        f.    E.C. and M.Z. smoked marijuana together and then went to bed between 11:30 p.m. and midnight.

        g.    The next morning, at approximately 5:30 a.m. or 6:00 a.m., E.C. woke up and found M.Z. unresponsive.

        h.    E.C. did not witness M.Z. actually take one of the blue pills, but that morning E.C. noticed there was only one blue pill and the other was missing.

**E.   Apple iCloud Data Corroborates ZIAFATHY and NOBAR's Involvement in M.Z.'s Overdose**

29.   On January 28, 2021, the Honorable Paul Abrams, Chief Magistrate Judge for the Central District of California, issued a search warrant for Apple iCloud data for M.Z., ZIAFATHY, and NOBAR pursuant to 18 U.S.C. § 2703 et seq.  (Case no. 21-MJ-491.)  The following communications are excerpts of what I saw pursuant to the warrant:

        1.   <u>Communications between ZIAFATHY and NOBAR on ZIAFATHY's Apple iCloud Account</u>

30.   On December 29, 2019, between approximately 11:46 p.m. and 11:47 p.m., ZIAFATHY and NOBAR exchanged the following text message communications:

    ZIAFATHY: "Was great seeing you [heart] I'm super happy things are going good and that you and I are good makes me so so happy"

    ZIAFATHY: "Love you"

    NOBAR:    "Likewise, all the best in 2020"

    NOBAR:    "Love u 2"

ZIAFATHY: "Hell yea! You/we got his night night talk to you soon [heart]"[2]

31. Based on my training and experience, I believe the foregoing text message exchange between ZIAFATHY and NOBAR further corroborates the historical cell-site data that shows ZIAFATHY and NOBAR met on December 29, 2019, shortly before ZIAFATHY met M.Z.

    2.   Communications between ZIAFATHY and NOBAR on NOBAR's Apple iCloud Account

32. On March 24, 2020, between approximately 10:33 p.m. to 10:44 p.m., ZIAFATHY and NOBAR exchanged the following text message communications:

ZIAFATHY: "Can you get norc I can move a bunch"

ZIAFATHY: "I haveNo job soNeedTo make something"

NOBAR:    "Seriously? No I can't and please don't text me for anything like that"

ZIAFATHY: "K"

NOBAR:    "Thank you"

ZIAFATHY: "The autopsy cams back and found you know what in her system :/"

ZIAFATHY: "Just yourself safe. Those things are bad news"

ZIAFATHY: "They have screenshots of all glue dialogues but I think it's all over"

ZIAFATHY: "I ended it by giving them Ayden to see once is month"

---

[2] This is the last text message exchange between ZIAFATHY and NOBAR on ZIAFATHY's Apple iCloud account even though there is additional, more recent correspondences between ZIAFATHY and NOBAR on NOBAR'S Apple iCloud account.

NOBAR:     "I don't understand what yore"

NOBAR:     "You're saying"

33.   Based on my training and experience, I know "norc" is slang for Norco, a brand name for acetaminophen and hydrocodone, which is a federally controlled Schedule II substance.  Further, when ZIAFATHY tells NOBAR "the autopsy cam[e] back and found you know what in her system," I believe ZIAFATHY is referring to the fentanyl found in M.Z.'s system.  Additionally, when ZIAFATHY tells NOBAR "Just yourself safe.  Those things are bad news," I believe ZIAFATHY is warning NOBAR of the dangers of fentanyl pills.  Lastly, when ZIAFATHY tells NOBAR "they have screenshots of all glue dialogues but I think it's all over," I believe ZIAFATHY is telling NOBAR that M.Z.'s family has her text messages with ZIAFATHY and NOBAR, but ZIAFATHY "ended it" by allowing M.Z.'s family to see their son, Ayden, once a month.

   3. <u>Communications between ZIAFATHY and M.Z. on ZIAFATHY's Apple iCloud Account</u>

34.   On June 9, 2019, between approximately 6:25 p.m. to 6:50 p.m., ZIAFATHY and M.Z. exchanged the following text message communications:

M.Z.:     "Did you get anything"

ZIAFATHY: "Not yet"

M.Z.:     "????"

ZIAFATHY: "We going to go to Saed together or no?"

M.Z.:     "Maybe babe"

M.Z.:     "Just go get it"

M.Z.:     "I don't want fenty"

ZIAFATHY: "All he's got"

M.Z.:      "Get it babe I pass"

35.  Based on my training and experience, I know "fenty" is slang for fentanyl.

36.  On September 11, 2019, between approximately 1:33 p.m. to 2:40 p.m., ZIAFATHY and M.Z. exchanged the following text message communications:

M.Z.:      "Where r u"

ZIAFATHY: "Saeds"

M.Z.:      "I want some v party"

M.Z.:      "?"

M.Z.:      "?"

M.Z.:      "When can I get from u"

ZIAFATHY: "Rushing babe"

M.Z.:      "Ok"

ZIAFATHY: "Getting 5 of fenti from him too later"

M.Z.:      "I want my v party"

ZIAFATHY: "Ima get super fade on the fenti later then eat more v party in morning"

37.  Based on my training and experience, I know "fenti" is slang for fentanyl and "v party" is slang for Vicodin, a federally controlled Schedule II substance.

38.  On September 9, 2019, between approximately 10:37 p.m. to 10:38 p.m., M.Z. sent the following text message communications to ZIAFATHY:

ZIAFATHY: "Do you want to save our marriage and get sober?"

ZIAFATHY: "With Saed in our lives it won't happen"

14

4.   M.Z.'s Apple iCloud Account

39.   On February 16, 2021, investigators received the
return for M.Z.'s Apple iCloud account pursuant to the search
warrant authorized by Chief Magistrate Judge Abrams.  The
information revealed that on or about February 12, 2020, nearly
two months after M.Z.'s death, someone wiped M.Z.'s Apple iCloud
account.

40.   In December 2020, investigators spoke with M.Z.'s
sister, A.G., who stated that following M.Z.'s death, A.G. took
possession of M.Z.'s cellular telephone and put it in "airplane
mode" to prevent any spoilation of evidence.  Specifically, A.G.
stated that on multiple occasions after M.Z.'s death, ZIAFATHY
asked her for M.Z.'s cellular telephone.  A.G. further stated
that during this time, she briefly removed the phone from
airplane mode and began to see automated emails on M.Z.'s
cellular telephone alerting of attempted password changes for
M.Z.'s email account.  A.G. told investigators that at some
point she believes ZIAFATHY successfully changed M.Z.'s password
and A.G. no longer had access to M.Z.'s email.  In an effort to
save communications between M.Z., ZIAFATHY, and NOBAR from
possible deletion, A.G. took screenshots of text message
communications and provided them to investigators.

41.   In March 2021, A.G. told investigators that during a
custody meeting for M.Z. and ZIAFATHY's son, ZIAFATHY asked A.G.
for M.Z.'s phone.  After A.G. told ZIAFATHY that she did not
have M.Z.'s phone, ZIAFATHY stated "I wiped it anyway."

15

42.   Based on my training and experience, I believe ZIAFATHY successfully accessed M.Z.'s Apple iCloud account and erased all saved data.  Additionally, while analyzing ZIAFATHY's Apple iCloud account, investigators found no communications between ZIAFATHY and NOBAR after M.Z.'s death; however, review of NOBAR's Apple iCloud account revealed communications between ZIAFATHY and NOBAR from March 2020 (see above).  Based on my training and experience, and the information above, I believe that ZIAFATHY intentionally deleted these communications in an attempt to destroy evidence related to his and NOBAR's involvement in M.Z.'s overdose death.

43.   Likewise, although investigators observed text messages between NOBAR and M.Z. on M.Z.'s cellular telephone, there were no saved text messages between NOBAR and M.Z. on NOBAR's Apple iCloud account, suggesting that these messages were deleted by NOBAR.

**F.   NOBAR and ZIAFATHY Continue Drug Dealing After M.Z.'s Death**

44.   During my review of NOBAR's Apple iCloud account, I found conversations suggesting NOBAR is continuing to sell drugs.  For example, on January 18, 2021, NOBAR and an unknown female named "Zena" exchanged the following text messages:

Zena:      "hey its Zena"

NOBAR:      "Hi there!"

Zena:      "you mentioned party favours"

NOBAR:      "It's not a party without them"

Zena:      "❄?"

NOBAR:      "I grow MJ, I have a license"

NOBAR:     "Also that"

45.   Based on my training and experience, I know that "party favors" refer to drugs.  I also know that the character "❄" or snow, refers to cocaine, which NOBAR confirms that he has, when he responds "Also that".

46.   In addition to the foregoing communications I observed on NOBAR's Apple iCloud account, I also observed several photographs on ZIAFATHY's Apple iCloud account indicative of drug-related activity.  For example, I observed photographs of multiple marijuana plants at different stages of growth, consistent with a marijuana grow operation.  I also observed photographs of ZIAFATHY posing with marijuana plants dated December 3, 2020, and December 11, 2020.  In addition, I observed a photograph of a clear baggie containing approximately 100 round blue pills with the inscription "M|30," dated September 22, 2020.  These pills appear similar to the round blue pill seized from M.Z.'s bedroom following M.Z.'s overdose death.

G.     **Investigation of the SUBJECT RESIDENCES and SUBJECT VEHICLES**

47.   A review of law enforcement databases, including DMV records and ZIAFATHY's telephone subscriber information, reveals that ZIAFATHY resides at 11915 Louise Avenue, Granada Hills, California 91344 ("SUBJECT RESIDENCE 1").  Additionally, based on witness reports and surveillance, investigators believe ZIAFATHY is driving a white 2021 Jeep Compass bearing California license plate 8RZE571 and Vehicle Identification Number ("VIN") 3C4NJDCB8MT512332 ("SUBJECT VEHICLE 1").  Specifically, on March

4, 2021, A.G. told investigators that ZIAFATHY was driving a Jeep Compass.  Based on SUBJECT VEHICLE 1's registration information, which is associated with Enterprise Rent-A-Car, I believe ZIAFATHY is renting SUBJECT VEHICLE 1.  In addition, on March 5, 2021, a surveillance team saw SUBJECT VEHICLE 1 parked in the driveway of SUBJECT RESIDENCE 1.

48.  A review of law enforcement databases, including DMV records, NOBAR's text messages, and NOBAR's telephone subscriber information, reveals that NOBAR resides at 2361 Overland Avenue, Los Angeles, California 90064 ("SUBJECT RESIDENCE 2").  Further, based on DMV registration records and surveillance, investigators believe NOBAR drives a white 2020 Tesla Model 3 bearing California license plate 8NVF463 and VIN 5YJ3E1EAXLF615652 ("SUBJECT VEHICLE 2").  Specifically, SUBJECT VEHICLE 2 is registered to NOBAR at SUBJECT RESIDENCE 2.  In addition, on March 5, 2021, a surveillance team saw SUBJECT VEHICLE 2 parked in the driveway of SUBJECT RESIDENCE 2.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

49.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cellular telephones and other digital devices, and in their residences and within their vehicles.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cellular telephones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cellular telephones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices, in their residences, and within their vehicles.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices,

in their residences, and within their vehicles, including in the form of calendar entries and location data.

e.  Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.  Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.  Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often

prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[3]

50.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

  51.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data

during a search of the premises for a number of reasons,
including the following:

        a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

        b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

    52.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

        a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress AMIR ZIAFATHY and/or SAIED ZIAFATHY NOBAR's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of AMIR ZIAFATHY and/or SAIED ZIAFATHY NOBAR's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

53.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

24

## VII.  <u>CONCLUSION</u>

54.   For all of the reasons described above, there is probable cause to believe that ZIAFATHY and NOBAR have committed a violation of 21 U.S.C. § 841(a)(1) – Distribution of a Controlled Substance.   There is also probable cause that the items to be seized described in Attachment B will be found on the persons, in the residences, and within the vehicles described in Attachments A-1 through A-6.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 12th day of
March, 2021.

_____
HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE